Can you call our first case? 17-0584, Michael C. Foley v. IIR, Inc., Anthony, U.S.A. Good morning. Can the attorneys who are going to argue each side approach the podium, please? Good morning. Can you identify yourselves for the record, please? Good morning, Your Honor. Caroline Kane on behalf of Appellant IIR, Inc. Richard Joseph Cito on behalf of the plaintiff's counter-defendant, Appellee Michael C. Foley. Ms. Kane, did you want to reserve some time? We'll give you 15 minutes each side. Did you want to reserve some time for rebuttal? Yes, Your Honor. Five minutes, please. You can try to speak up a little louder. Sure. All right, Ms. Kane, you go right ahead. May it appease the Court, again, Caroline Kane on behalf of the Appellant IIR, Inc. IIR, Inc. is a general contractor who performed a total gut rehab at the property of Mr. Foley after a fire occurred at the property and caused a total loss. We are here today asking in this appeal for the Court to provide, to reverse the trial court in that the trial court held there was no valid and enforceable written contract between the case. Okay, I didn't hold that there was no valid and enforceable written contract. What he held was that the contract wasn't sufficiently proven because the scope of loss document, which the contract continuously referred to, wasn't attached, and it was never given to him as evidence. Is that correct? And so how could he say that there's a valid written contract when huge sections of it and the requirements that each party had to fulfill in order to establish that contract was never presented to him? So in Exhibit 9, which is what we contend is the contract between the parties, in one part of the contract it says per scope of loss. The scope of loss is a document that's prepared by Mr. Foley's insurance company, Farmer's Insurance, and it contains an itemized list of the damaged property within his home. And what it would take to, or what it was going to cost. Correct. Importantly, it contains the replacement cost value, which is the cost to replace the damaged property brand new. This document wasn't attached to Exhibit 9. However, we argue that the contract is still enforceable based on the Witzer case, which is cited in our brief. And in, I guess, analyzing the issue of whether or not a contract is enforceable, despite the fact an attachment isn't attached, the court found that where there's knowledge between the parties. But wasn't there a discrepancy between the parties of exactly what that document contained? Not as to what the document contained. And I would argue that the performance of IIR Inc. isn't really contested in this appeal, in that Mr. Foley has only raised a few items that were not completed by IIR Inc., and we admit that those items were not completed, and we do not contest the part of the damage award that was awarded to Mr. Foley for those items that were incomplete. So it's not really the performance of IIR Inc. that's contested in this case. It's the fact that Mr. Foley has not paid the full value of the written contract and of the services that IIR Inc. provided. Wasn't the trial judge, in his finding, didn't he repeatedly say that in order for this written contract to be valid or to know exactly what it was that the parties were asking for, he needed the scope of laws? And without that, he did not have what the contract, what the parties agreed to. And wasn't there a discrepancy on whether the parties actually did agree? Didn't the plaintiff say that that wasn't his signature? He did not at trial, Your Honor. The plaintiff admitted that that was his signature, and he also initialed Exhibit 9 multiple times on the first page and the second page as well. Exhibit 9 also contains a schedule of specifications, which outlines the work that was to be done in each room of each floor of the three-floor building. IIR Inc. basically did a full gut rehab. They replaced the floor, the entire kitchen. They repainted the walls. Were all these things detailed in this written agreement, that they were going to be doing this, this, this, this? The things you've just outlined. Sure. So the schedule of specifications does outline those items that were done. They redid the flooring. As I said, they repainted. In the kitchen, they did granite. What did the document then that was in evidence say? The document in the evidence is a four-page document. The first document contains the contract price of $531,000, as well as it says C per scope of loss, and that is the scope of loss document that Mr. Foley's insurance company composed and that Mr. Foley did have a copy of. That would have been sent directly to him, and IIR Inc. did keep that document at the property. Unfortunately, once there was a lockout because the relationship between the parties went south, that document was at the property at that time, and we do not have a copy of it. And you didn't add trial? There was not a document admitted into trial. But what that document shows is, as I said, the damaged property within Mr. Foley's home. How do you know what it shows if there's never been a copy? There was a copy, and that's what the scope of loss contains. It's an insurance document, and that's how the replacement cost value was assessed against the property, was through that scope of loss containing the replacement cost value of the property that was replaced by IIR Inc. The worst case, was that the one you just mentioned? Witzer, yes. In that case, was that a bench trial where a court determined that there was an oral agreement? No, Your Honor. In the Witzer case, there was an asset purchase agreement as well as an escrow agreement, and both those agreements were written. And within the purchase agreement, it referred to the escrow agreement, but that agreement wasn't attached. And yet, the court found that since the parties knew of the contents within that agreement, it was still deemed part of the contract and that part of the contract. How does that support this case? This is a case where didn't Mr. Foley allege in his complaint that there was an oral contract? He did. So Mr. Foley is alleging that there is an oral contract that was entered into between the parties before this written contract was entered into, and we are arguing that that cannot be the case. There was no definite in certain terms until the written contract was executed, and it was the intent of the parties that that contract would be the contract between the parties. And there could not have been an oral contract at the time Mr. Foley alleges that there was because at that time, they did not know the scope of work and they did not have the scope of last document, nor did they know the value of the repairs that needed to be made. So that is why we contend that there was no oral contract. There was, in fact, a written contract that should be enforceable in this case. Was the written contract offered into evidence? It was. It is Exhibit 9. Okay. IIR is Exhibit 9. Without the scope of loss? Without the scope of loss. That's correct. How long of a document was the scope of loss? I don't have a page number, Your Honor, but it contained each item that was damaged within the property. How many references to the scope of loss document were contained in the Exhibit 9? One on the first page. And that's the only reference to it? Correct. Okay. So is the Illinois Insurance Restoration the contract that you're referring to? What is this? Illinois Insurance Restoration is IIR, Inc. That's correct, Your Honor. And Exhibit 9 is the document that we are contending is the written contract. Well, is it one of these exhibits attached to the brief or no? It is attached to the brief, Your Honor. Is it A? Yes, Your Honor. All right. No. No. Is this the specific basis? It is within Exhibit A, Your Honor. Is there any information that was in the scope of loss document that is not contained in Exhibit 9 or Exhibit A? Yes, Your Honor. So as I mentioned, the scope of loss contained each item that was damaged at the property. Exhibit A or Exhibit 9. So wouldn't that be necessary to determine what the parties contracted for and whether or not there was a breach? Well, Your Honor, I believe that we could prove breach by the fact that IIR, Inc. did perform a full gut rehab at the property. The trial court in assessing our damages under unjust enrichment claims stated that he could see from the pictures that were entered into evidence as well as the testimony of the parties that substantial work was done at the property. Everything was brand new. The pictures show new cabinetry, new granite countertops, new wood flooring, and that the work quality was quite good from those pictures. We believe that we can prove that we substantially performed the contract minus the items that Mr. Foley is contending that we did not perform. And as I said, we are not disputing those few items that amount to $7,000 worth of damages. We're just trying to recover under this contract for the work that was actually performed. So you did receive substantial payments. Is that correct? We received a payment of half the contract, which is $265,000. And was that directly from the insurance company? The insurance company pays out to Mr. Foley, and then Mr. Foley pays IIR, Inc. The insurance company can't directly pay IIR, Inc. So you received the $265,000 from Mr. Foley and the claim of the remaining up to, what was it, $530,000?  The scope of loss was $530,000? $531,000, yes. And you received none of that? So the outstanding balance is $265,000, $885.48. Okay. And the trial judge's position was that, one, you didn't establish it with regard to a written contract because of the lack of the scope of loss document, correct? Correct. And found that the oral agreement between them was binding? And based on the oral agreement, you had received everything that was contracted for in the oral agreement? So based on the oral agreement, we were awarded damages under IIR, Inc.'s unjust enrichment claim. The court found that we substantially performed the contract, yet he said that we performed the contract in an untimely manner based on the alleged terms of the oral contract. So he deducted, then, the cost of the loss of rent revenue? Correct, which we are contesting in this case because we do not think that we performed the contract late. There was no way there could have been a contract until February of 2013, at least, and under the terms of, I guess, under that timing, the contract would have been performed on time. And also What does it say in the contract that you're relying on? The timeframe that makes it, according to you, clear that the work was done timely? Sure, Your Honor. So that is on the third page of the contract within the schedule of specifications. It said Well, could you just, you know, reference where you're talking about in terms of your own brief? You've got an Exhibit A. You know, you have Exhibit B. What is this contract that you're referencing? So within Exhibit A, Your Honor, Yes. You'll find the schedule of specifications, which is part of the contract. Well, what number is it as far as the appendix? A-26? A-29. A-29 is the schedule of specifications? Yes. Okay. And in the first paragraph under schedule of specifications, it says expected project time of 12 to 18 months from issue of work permits. The work permits in this case were issued in May of 2013. So by that timeframe, this contract would have been performed on time. And how did the court figure it wasn't? Because the court found that instead of finding that this was an enforceable contract, they found instead that there was an oral contract that was entered into one year prior to this in February of 2012 when the parties first discussed the possibility of IIRE performing reconstruction. And he said from that timeframe, 12 to 18 months from February of 2012, we performed the contract in an untimely manner. Wasn't there something in the contract too that said this is the entire agreement between the parties? Yes. Where is that? Sure, Your Honor. A what? A-28. A-28. What number of the all proposals are subject to in that? Sure. It's in paragraph number 13. This agreement constitutes the entire agreement between the parties. It may only be changed by written instrument signed by both parties. There are no oral agreements of any kind in all caps. And this was executed when? This contract was executed February 16th of 2016. Where does the date? Excuse me, 2013, Your Honor. Where does the date show up on here? There's signatures. Sure. The signature initial date is 2-16-13. Where are you getting that? Sure. It's about halfway down the page next to contract amount. There's a signature. Oh. MCF is Michael C. Foley. 2-16-13. Yes. When was the supposed oral contract? The plaintiff alleges that it was in February of 2012, which is one year prior to when this agreement was executed. What did he say this was, the plaintiff, at trial? He said that this was an enforceable agreement. He pointed out the fact that the scope of loss wasn't attached, and, therefore, it was not an agreement. And under our appeal work intending, it is still an enforceable agreement. I think that the terms show and the party's intent show that they intended for a full gut rehab at the property. It's signed and initialed by Mr. Foley. You know, on this page, it's signed once, and then it's initialed three times. And I think that manifests in assent to the agreed terms of this contract. And he also. What reasoning would he have to want the oral agreement of earlier to be the, you know, contract between the parties? I believe his incentive would be so that he doesn't have to perform under the terms of our actual contract, meaning he doesn't have to pay the full amount for the value of services that we performed, because he contends that we were untimely in performing them, which, again, we contest. We believe we were on time if this contract is deemed to be enforceable. And, secondly, I think he's seeking to benefit from the fact that this would not be considered an enforceable agreement by not paying the full value of those services, which is $265,000. The last payment the insurance company issued was like $79,000. Correct. Issued to Mr. Foley. Yes. And the judge orders that that last payment be given to your company, correct? So the judge ordered that that check would be issued to our company under our unjust enrichment claim. Basically, that was a check that was sitting in escrow that hasn't been cashed yet by either party. So that amount was offset by Mr. Foley's damages, which was the $7,051 in incomplete work, which we are not contesting, and then the $17,400 that he claimed in lost rents, which we do contest because, again, we do not believe that this contract was not performed on time. Well, how many other checks had, you know, the construction company received? There was a check for the initial payment of $265,000. That is the amount that IIR Inc. was paid in total for this project, and then the court awarded the $79,000, which was offset by the $24,000. Yes. So about $50,000 is what the court awarded. Correct. Based on an oral contract occurring sometime before these written documents were signed. So that was actually based on our unjust enrichment claim. The court found that there was substantial work done at the property, and based on that, he awarded basically that check to IIR Inc. We do contend in our appeal that that was an error because the real value of the work that we provided was $531,000. That is the amount that's represented by the replacement cost. Well, is that based on the fact that the insurance company said they would give him up to $600,000 to rebuild his property, or is it based on a number of bills that you submitted showing what you paid for the materials, how many hours you labored, and that's how you came up with your $265,000 you were still owed? Sure, Your Honor. So the $531,000 was the replacement cost value that Mr. Foley's insurance company determined that would be the cost of the materials and labor to replace everything at the property brand new. Sure, that's what the insurance company determined. Yes. But don't you have a burden to show that you actually expended a certain amount of hours and materials to come up with that money? It's not just because the insurance company says it's what's going to take to fix this place. Right. So that is what the $531,000 represents. It is the insurance company's assessment of the value of the work to be done at the property. IIR Inc. did perform that work at the property based on the insurance company's assessment of the damages that were done. The insurance company came in and said, looks like you did what you were supposed to do for this amount of money? The insurance company said this is how much it would cost to replace brand new, and that's what we performed. Judge Sherlock looked at the amount under your unjust enrichment claim, the amount that you received, and the amount that the insurance company paid out, and made a determination based on that that the amount that you proved that fully was unjustly enriched was $79,000. Correct? With the offsets. So he did that because that was the check that was sitting in escrow? It wasn't like the full value of what the insurance company paid to fill out? I think Judge McBride's question, and mine as well, is what proof did IIR submit of their costs? So we did not provide receipts or anything in this case. That is not in evidence, as you will see when you review the record. You have the testimony of Mr. Duarte, who is the president of IIR Inc., of what the work was done and what he did pursuant to not only the scope of loss, but what Mr. Foley asked for during the course of this construction project. And wouldn't it be up to the trial judge to determine whether that testimony was credible or not? It was. And I don't think that the trial court found that it was uncredible evidence because, as I mentioned, the trial court found that the work that was done at the property was substantial and that it was quite good. What we're claiming is that the trial court said that it should be what the insurance company agreed to pay for the value of work. That was in its holding. And what we're contending is that that was actually the $531,000. That is what the insurance company agreed to pay for this work, and it's not the $79,000 because that's just a check that was waiting in escrow to be cashed. So we're seeking the full value of what the insurance company agreed to pay, which was $531,000. Did the insurance company, in fact, pay all that to Mr. Foley? No. So the discrepancy is because of what was deemed recoverable depreciation. So under Mr. Foley's insurance policy, he was entitled to recover the full replacement cost value of the property, meaning he was entitled to recover the amount it would cost to replace everything brand new. And this is different from the actual cost value because it takes into account the discrepancy between what it costs to replace everything brand new versus what the property was worth because of depreciation. So the difference between those values is recoverable depreciation, which Mr. Foley was entitled to recover, but he had to act pursuant to his own policy in order to recover it. And Mr. Foley was aware of the procedures to do that. It's outlined in Exhibit 4, which was entered into evidence in this case, and it says you have to work with your insurance adjuster and provide documentation. At one point in time, Mr. Foley did work with his insurance adjuster to get an extension because he was negotiating having the scope of loss revised with his insurance adjuster so that he could increase the scope of loss value. So Mr. Foley was aware of these procedures. He knew how to do it. He did not do it the second time, and his insurance company did not pay out that amount because of Mr. Foley's own actions and pursuant to that policy. But we argue that I-31 is still the value of the work that was performed and is still the value of the work that we provided and that we are still entitled to that full amount. Right. So I understand where you're going with this, but where is the proof of that's the amount that you are owed? Where was that in the trial court? The 531 number? Yes. So that's in Exhibit 5. I understand. That's what the insurance company said it's going to cost. Where's the proof that that's the amount of money that you expended on this property? The proof, I guess, is in our performance in that we've replaced everything in the home. So you're relying solely on the testimony? The testimony and the pictures that were entered in the evidence. Okay. Thank you. Thank you, Your Honor. Thank you, Ms. Handler. Let me ask you just one question. Are the numbers going to change if this was found to be a written contract? No. The contract is very clear in that the contract amount was 531,000, and that is the amount that we're seeking, obviously offset by what we were already paid and by the $7,000 that we did not complete. Aren't you asking for more money here? We're asking for the contract to be enforced. That is more money than what we were awarded on our unjust enrichment claim. That's correct. Okay. Thank you, Your Honor. Mr. Zito. Thank you, Your Honors. Just a quick point because there was some back and forth in the briefs regarding the standard of review regarding the formation of a contract. And, you know, it's our contention that it doesn't matter what standard of review you use. There was no enforceable written contract in this case. However, you know, it's kind of instructive of why the standard is, why there's such deference given to the trial judge with respect to formation issues, and that's this case, right, because it comes down to a credibility determination when you hear competing versions of the same events. This is why we defer to trial courts regarding whether or not a contract is formed. Appellant's argument also, their contention about the scope of the loss issue is a little muddy, and I just want to quickly just clean it up a little bit if I could. And obviously I'll, hopefully this will actually clarify it rather than muddle it further. But my understanding of the court's ruling regarding the scope of loss was not that it was, that because the document wasn't attached, therefore, as sort of a formal bar, that this contract isn't enforceable. It was that the actual substance of that, of the omission, made it impossible to establish that there was any kind of mutual assent between the parties. So it wasn't just sort of this formalistic, you know, decision of the law by the court, so much as it was part of the court's evaluation of whether or not there was mutual assent in sort of its overall credibility determination. Did Mr. Foley admit on the stand that he had initialed and signed that written contract? Yes. Okay. So I think the appellant's position is that based on that admission that he had initialed and signed, one, that the time frame, they didn't blow the time. If the portions that the plaintiff is admitting to, signing and agreeing to, clearly show that it's 12 to 18 months later, they didn't blow their time and you weren't entitled to the rent compensation. Well, with respect to the timing, the contract that was signed and, you know, to the extent it's an adhesion contract, I mean, we didn't brief that. We're not going to even contend that for these purposes. But the fact of the matter is that the 12 to 18 months within the issuance of permits, I think necessarily implies as a matter not only of contract interpretation, but also as a matter of equity, that the permits would be applied for in some expeditious manner or at least not waiting for over a year before you go ahead and apply for the permits. Now, Mr. Foley and Mr. Inc. were in negotiations about doing this work right after the fire in February of 2012. They reached an oil agreement in the middle of February of 2012. And a dumpster was moved in and, you know, some demolition work began and, you know, the project wasn't going. Wasn't your client not in charge of that? Wasn't some friend of his the one who was contracting with Mr. Duarte with regard to boarding up the building and taking care of all those initial things? Sure. The board up was, I think, a one-day job. That was the day after the fire. But the project began in earnest, you know, what Mr. Foley hoped would be in earnest, maybe a week subsequent to that. And IIR, you know, according to the testimony, there was a dumpster in the backyard and there was some work that began and then, you know, it would stop for months. That was in February of 2012. The permits, the building permit from the City of Chicago Department of Buildings wasn't issued until May of 2013. So it's true that if you use May 2013 as the starting point of that 12- to 18-month window, then that shifts whether or not IIR's work was complete, but, you know. So the permits were actually issued within 10 months of this paper. Is that right? I'm not sure which paper. Well, the Illinois Insurance Restoration Form. It's in a day. Okay. It says it was issued March 22, 2012. That's the date on it. Okay, and the permits were issued for this case in May of 2013. Right, and then it says it's signed February 16 of 2013. Well, let me ask you this. What is this thing? What would you call this? Yeah, this was a piece of paper that was put in front of, by a general contractor, put in front of my client. Now, I think it's fair to say that he understood it to be something that was related to the work. It didn't – It doesn't say there are no oral agreements of any kind, that this agreement constitutes the entire damage between the parties. It's kind of a classic integration clause. I mean, what do you think – what would you call this piece of paper? Well, it purports to be a contract, obviously. It does. And, you know, it has certain earmarks of what a contract is to look like. Yeah. However – It has actually the scope of the loss value, it has the deductible, it has depreciation, it has the cash value, it has payment schedule, it has a number of check marks explaining how it's going to be done. Sure. There's two pages of what kind of work is going to be done, and then it explains that this is the entire agreement between the parties, and then it has a schedule of specifications. Are these the things that we're missing? By missing, do you mean – This isn't the scope of the – No, no. The scope of loss is still a wall, missing in action. Yeah. But so in this, it's several pages, and, for example, on the third or fourth page, it says that on the first floor living room, dining room, there will be three-fourths-inch oak flooring, three-and-a-half-inch molding, recessed lighting. The foyer is supposed to have a tile floor, three-and-a-half-inch casing with five-and-a-half-inch base. The second floor has recessed lighting fixtures. So I guess what I'm asking you is this isn't very specific? It's our condition that it's not sufficiently specific for a trial of a site. Well, have you ever had a case where the court went backwards and said that there's no written agreement but there's an oral agreement? No, I don't believe I have. Was there any case where you think that – Well, I think that the trial court recognized that there was a skeletal bare-bones agreement between the parties that made IAR's presence on the lot sensible. And that bare-bones agreement was that IAR would provide home remodeling services in connection with a homeowner's insurance policy, and that work would be done between 12 and 18 months. Now, that was the oral agreement that took place that was formed in February of 2012. It's not a very broad agreement, and I think that – What were the terms of the oral agreement? Those were the terms. What? That Mr. Foley would receive these home remodeling services. Yeah. How could that be a contract? What was agreed to? That IAR would receive the insurance proceeds from the policy in exchange for doing this work. What work? I'm just trying to figure out how did the court figure out there was an oral contract? What were the terms, and how was that arrived at? And the specific answer to the what work question was what a lot of the testimony at trial that was conflicting was all about was, obviously, my client and Mr. Dugo testified that X, Y, and Z were not done, and IAR's witness, Officer Mr. Duarte, testified that A, B, and C were done, and X, Y, and Z were done, and explained it thusly. And so I think that there was a great deal of conflict about just what constituted the work, and that's why the trial court said this scope of loss document, which is referred to in this purported contract that was written a year after the parties got together and IAR started doing work, that this contract constitutes rather that that scope of loss would be invaluable in determining just what the obligations of the parties were, just what the work was supposed to be done, and so on. So the absence of that document... The absence of the document, you mean attached to this document or the absence in general? I thought there was a copy of the scope of loss. No, there's no scope of loss document in the record anywhere. As far as the record is concerned, I think that IAR's representative and witness testified that it existed and it was mailed to the house that was vacant. Mr. Foley testified that he had never seen the document at all, and the trial court resolved that discrepancy very directly in his findings when he said, I don't believe it. He said those words. I don't believe it with respect to the scope of loss and its absence from the record. So there is no scope of loss anywhere? Correct. All right. So are we to review the trial court's finding that the lack of the scope of loss document attached to the contract invalidates this contract? Plaintiff admits he initialed it. Plaintiff admits he signed it. So are we to evaluate that decision that the lack of that document negates the entire written contract? Are we looking at that determination as manifestly erroneous or de novo? That should be reviewed under a manifestly erroneous standard because it concerns a formation issue rather than a construction of a term. So formation issues, you believe, are reviewed for a manifest weight of the evidence? Correct. Not de novo. Correct. With respect to the, again, you know, besides the absence of the scope of loss, there are other elements to this case that militate toward a finding of the contract being indefinite and insufficiently or too vague to be deemed an enforceable contract. Chief among them is identified by Mr. Duarte, IHO's sole witness himself, when he identified that he was on cross-examination, was confronted with the possibility that or the question of whether or not his general contracting license was valid for jobs in excess, valued in excess of $500,000. And when confronted with the possibility that it was not, he testified that while it says $500,000 in the document, I'd like to get the exact language so I don't misquote him, and this is in supplemental record 212 to 213. He testified that it was a possibility at the time with respect to the value being in excess of $500,000, but it was not a certainty. So this is just, you know, one illustration of the extent to which this, and I think that Your Honors identified it during the appellant's presentation, is that this contract is necessarily pegged to the value assigned to it by an insurance company. And that fact, you know, other than Mr. Duarte acknowledging that uncertainty, the sort of inexorable, you know, connection between the value, and I put that in quotes, and the numbers on this purported contract are right there on the document itself, in that, you know, IIR is maintaining that we don't have anything to do with the insurance company. That's between the homeowner and his insurance company. But these numbers that are listed as the numbers for the contract are insurance numbers. In fact, it says depreciation, deductible, RCD. These are insurance terms. So, you know, it's a little disingenuous to then come back and say, well, we don't have anything to do with the insurance company. They have everything to do with the insurance company. They're, you know, the reason that this recoverable depreciation was not recovered. And that number is really the number that sort of the gap here, right? You know, the company, IIR, received somewhere north of $320,000 in connection with this job. You know, the amount that they seek is in large part the number, the amount of the recoverable depreciation. That's certainly the lion's share of it. I know that they dispute the delay-related expenses that were awarded Mr. Foley as well. But the lion's share of it is the recoverable depreciation. The reason that Mr. Foley did not qualify for the recoverable depreciation is the fact that he didn't have the papers to submit to the insurance company in time because those papers didn't exist because the work wasn't done and the expenditures weren't made. That's why there aren't a bunch of receipts and invoices and bills attached to the record, is that they didn't exist because the work wasn't done. And that's why this lawsuit was initiated to begin with. So, you know, it's a little surprising for appellants to now allege, well, you know, if Mr. Foley blew the recoverable depreciation, that's not our problem. Pay us. Pay us that number. That number is gone, and that number was gone because the work wasn't completed and recordkeeping wasn't done and expenditures weren't made. Now, with respect to the oral argument issue, and, you know, we do contend that that February 2012 agreement was, in fact, an enforceable oral agreement, albeit skeletal or bare bones as it was. To the extent, this is again, there's a volley regarding this in the briefs, and I just want to address it. To the extent that this court elects to, or declines to, endorse the part of the trial court's ruling that there was an oral agreement between the parties, we do believe that a promissory estoppel argument, even though it wasn't pled as such at the trial court, is appropriate in that it approximates what was actually happening. And to the extent that it wasn't, that was, you know, the argument goes that it was, that argument that that assignation as promissory estoppel was forfeited by the fact that it wasn't pled as such, we would contend that the fact that, you know, there was, not only was there a breach of contract claim by plaintiffs in this case, but also a fraud claim. And so to the extent that there would be an opportunity to test evidence regarding detrimental reliance by the plaintiff, that was in there, embedded already within the fraud count. And so there was testimony regarding that and evidence adduced at trial regarding that. So appellants aren't prejudiced by this sort of reframing of the oral contract issue as an equitable issue. You know, Mr. Foley was only awarded some, I think, a trial was awarded $24,451.49, and that consisted of the work that had to be done, you know, to pay somebody, and there were receipts provided and entering the evidence regarding every penny of that, and then loss rents. And that's it, that came to $24,000, yeah, $24,451.49. Mr. Foley does not seek any more than that. Mr. Foley, while he still contends that the work wasn't done sufficient to his, you know, to what he wanted and it wasn't done often, you know, to a professional standard, that's not before this court, obviously. That was at the trial court, and the trial court decided that the work was largely okay or very good, and that was based on a bunch of photographs. There was no expert testimony in this case, or any testimony in this case, about the actual dollar value of the work. And so, you know, in considering the unjust enrichment claim, I think what the court did was sensible in saying, here's what the insurance company was willing to pay, and here's $79,000 sitting in escrow, by the way, payable to both Foley and IIR. IIR's representative had, as the testimony, as Mr. Foley's testimony provided, that, you know, that check was made to both parties. Again, just to sort of collect the record regarding IIR's involvement in the farmer's insurance sort of work chain or workflow. Yeah, but regarding the, yeah, regarding that recoverable depreciation number, that number represents the full amount that the insurance company was willing to pay if it was done on time. That money was forfeited, and what was left over was amounts that were released to IIR already, and amounts sitting at Chase Bank that was then subsequently disbursed to the parties according to the trial court's order. And with that, I'll conclude. Thank you, Mr. Strickland. Ms. King? Thank you, Your Honor. As far as the standard of review, we contend it should be de novo. The judge's ruling was based on his interpretation of Exhibit 9 as a contract, and therefore we contend it should be de novo review. As far as the timing issue, you know, Mr. Foley contends that a contract was entered into in between February of 2012, and then permits were not issued until May of 2013. However, during that time, Mr. Foley was negotiating with his insurance company to try and get his scope of loss revised and increased, so the delay had to do with Mr. Foley trying to get more money to be able to renovate his home and get the scope of loss revised. Do you agree with counsel that there's absolutely nothing in the record that contains the scope of loss? The scope of loss is not in the record. According to this document, Exhibit A, the scope of loss, it says RCB $363,485,000. So that was a contract that was entered into in March of 2012? That was the original scope of loss that Mr. Foley's insurance company had issued? Right, and then it was modified. And then it was modified? Or enlarged? Yes, and that's when the parties executed the revised contract in February of 2013. And what would be in this scope of loss value? In the first one or the second? The second one. The second one, it contains an itemized list of what was damaged and the cost for replacing that property. That the insurance company said they would allow? Yes. Is that the scope of loss or the scope of the work? The document's called scope of loss. But what is it really you could call a cat, a dog, but it's still a cat? Yes, so that was also the work to be done according to the understanding of the parties. Yes. And would you normally have to show the work by way of the cost of materials and hours expended to justify a payment? Yes. And where are those papers? So you are correct. Mr. Foley had to provide those papers to his insurance company in order to get the insurance company to pay out the claim. So those were provided to Mr. Foley in relation to getting the payments paid out. But between you and Mr. Foley? Yes. The contract between the construction company and Mr. Foley, in order to obtain your payment, don't you have to show that you spent so much for materials, you spent so many hours of labor, and you did all these things that you say entitles you to the entire balance of the contract, $531,000, give or take a few? Correct, Your Honor. So what we have is this contract, and we can show that the work was done at the property by the testimony of, I would say, both the parties. In Mr. Foley's complaint, he can test that certain items weren't done. And as I mentioned, we admit that those items weren't done, but everything else was. And based on the knowledge of the parties and the understanding, there was a full gut rehab to take place, and it did. Were there any testimony that this was a fair and customary charge? We have the insurance adjuster's evaluation or assessment of the fair cost of replacing these materials and the labor to replace those materials. The insurance adjuster testified to a depreciation formula. That has nothing to do with the fair costs? Correct. The depreciation formula doesn't – it's just what Mr. Foley is entitled to recover under his policy, and that went into the cost of the labor. Well, I'm not quite sure I understand. Is there any case that would suggest that an insurance company's scope of loss would ever support a claim for damages? So – excuse me. So just the fact that the scope of loss contains the replacement cost value, that is the insurance adjuster's evaluation of the cost, and that's what we have, and that's what the parties agreed to pay for the work that was to be done at the property. Sure, but the parties agreed that for this amount of money, this kind of work will be done. Yes. So then when they're fighting over whether the work was done or not, the one that says it was done has to prove it was done. And the one that says it wasn't done, you know, establishes that, no, they said they were going to do this, and it was never completed. So I don't think that that's a point of contention at this time. As I said, we do not dispute the fact that certain items weren't done, and we're willing to pay for those items. But we would like to be paid the value of the work that we did do. But you haven't established that. Yes, we have a figure from the insurance company saying this is what it will cost to replace it, but we don't have any supporting documentation from IIR, and nor did the trial court. So what we have is the pictures of the property, the testimony of the witnesses, and just the fact that Mr. Foley has only contested that a few items weren't done. And as I said, we don't mind paying for those, but we'd like to be paid in full for the items that weren't done. And so the court's really, the whole basis of the court's decision was that since this wasn't done in a timely fashion, I'm going to award a certain amount for not being able to lease the property. Is that really what the court came down to at the end? So that goes to Mr. Foley's allegation that there was an oral contract between the parties in February of 2012, and because the court found that IIR did not perform the contract between 12 to 18 months from that date, they were entitled to lost rents. So did the court conclude that this oral contract definitely had a timeframe in it? It did. We argue that that goes against the manifest weight of the evidence. Where would that have been? Who testified that the parties orally agreed that the contract would be finished within 12, was it 12 to 18 months of the permits being issued? That was a term of this oral contract? The term of the oral contract, according to Mr. Foley, was that it would be done in 12 to 18 months from the time that the parties first initially talked about this work being done, which was in February of 2012. As we argue in our brief, that's unreasonable, because Mr. Foley didn't allow any work to be done until the scope of work was reassessed. So that's why there was a delay in timing between... So Mr. Foley conceded at trial that he didn't let IIR in to do any work until... No. No. IIR in couldn't perform any work because there was no scope of work to perform at that point. And Mr. Foley at trial admitted that he was working with Heather McBride, the insurance adjuster, in order to readjust that claim. And until she did that, there was no work that could be done because there was no scope of work document. And there was no value of the scope of work at that point. As far as Mr. Foley's promissory estoppel claim, we claim that that's forfeited on appeal due to the fact that it wasn't raised in the trial court, nor were there any findings of the trial court. And as far as Mr. Foley's damages, we contend that not only did he get $24,000 worth of damages, but he also got the full value of a completely renovated home in Logan Square. And what we're asking to be awarded here is just the full value of our work that was done at the property. The remaining balance is $265,000. Yeah, but that would be less the $80,000 that you were... well, the $50,000. Yes, that would be less the $50,000. So about $190,000? Yes. Thank you, Ms. King. Thank you, Your Honor. You both did a wonderful job on the briefs, and you did a very good job in the oral argument. We'll take the matter under a five-minute instrument. Give me an answer as soon as possible. Thank you. Court's adjourned.